(No. 18798.—

LOUIS GLADSTONE, Plaintiff in Error, *vs.* ISRAEL WARSHOVSKY *et al.* Defendants in Error.

*Opinion filed October 25, 1928—Rehearing denied Dec. 11, 1928.*

GROSSBERG, LYON & BRILL, for plaintiff in error.

WILLIAM LEVINE, for defendants in error.

Mr. JUSTICE DUNN delivered the opinion of the court:

Louis Gladstone brought suit in the circuit court of Cook county against Israel Warshovsky, Anna Warshovsky and Henry G. Zander to enforce performance of the following contract:

"*May 13, 1925.*

"Witnesseth, that Louis Gladstone, Chicago, Illinois, hereby agrees to purchase at the price of eleven thousand five hundred seventy-five dollars the following described real estate situated in the county of Cook, State of Illinois, southwest corner Menard and Addison, one hundred (100) feet more or less by one hundred and twenty-five (125) feet and the northwest corner Lockwood and Addison, eighty-three feet (83) by one hundred and twenty-five (125) feet more or less to the alleys thereon.

"And Israel Warshovsky and his wife, Anna Warshovsky, agree to sell said vacant lots at said price and to convey to said purchaser a good merchantable warranty deed with release of dower and homestead rights.

"We, the sellers, hereby acknowledge receipt of the sum of five hundred dollars, as deposit on the above described property, and the balance is to be paid when clear title and deed is delivered.

"Taxes, general and special, should be prorated to the date of delivery of deed.

"This deposit money should be held in escrow by Benjamin J. Cossman, attorney for all the parties concerned.

"Commission of Rubenzik and of Frank Waisman should be five (5%) per cent.

LOUIS GLADSTONE,
ISRAEL WARSHOVSKY, (In Yiddish)
ANNA WARSHOVSKY.

"Seller also agrees to deliver abstract to B. J. Cossman for continuation within 2 days.

Witness to signatures,
B. J. Cossman."

The Warshovskys answered jointly and Zander separately, replications were filed, the cause was referred to a master, who made a report of the evidence and his findings, and the court, after overruling exceptions to the report, entered a decree dismissing the bill for want of equity. The complainant has sued out a writ of error.

The Warshovskys owned the lot at the southwest corner of Menard and Addison and had a contract with Zander

for the purchase of the lot at the northwest corner of Lockwood and Addison. The bill alleged that the complainant had always been willing and ready to perform his part of the agreement and had tendered the balance of the purchase price, $11,075, on June 25, 1925, but the Warshovskys refused to perform, and the complainant was, and had always been, ready to pay the sum of $11,075 whenever the Warshovskys and Zander should deliver a good and sufficient deed for the premises.

Zander's answer alleged that under his contract with Warshovsky a balance of $868.75 remained due, with six per cent interest from September 14, 1925, and he was not bound to convey the title until such amount had been paid in full. The answer of the Warshovskys alleged that the description of the premises in the contract was so uncertain and indefinite that the premises involved could not be identified from the contract, and relied on the Statute of Frauds as a defense. Their answer also alleged that in the negotiations F. Waisman, a real estate broker, was employed in their behalf and pretended to represent them, though he was, in fact, interested with Gladstone in the purchase of the premises, but the Warshovskys did not discover that Waisman was so interested until after they had elected to terminate the contract, as hereinafter noted; that upon his suggestion Benjamin Cossman, a lawyer, was employed to take care of the matter for all parties; that Warshovsky could not read or write, except that he could sign his name in Yiddish; that Anna Warshovsky could not read or write, except to sign her name; that the agreement reached as to purchase price was $11,575, and the purchaser was to assume the payment of all special assessments levied against the premises; that the contract as written did not, in respect to special assessments, correctly state the agreement; that they would not have signed the contract had they known of the mistake; that nevertheless they determined to perform the contract as written and furnished the complainant

or his attorneys with abstracts and other muniments of title disclosing the condition of the title, and were at all times ready, willing, able and anxious to perform the contract as written. The answer denied that Gladstone ever offered to perform or tendered the purchase price, and alleged that the Warshovskys from time to time requested him to pay the rest of the purchase price, being at all times ready to convey title upon compliance by the appellant, but he wholly refused; that on July 27, 1925, they notified him that unless the agreement should be consummated by performance within five days they would declare the contract forfeited; that nevertheless Gladstone wholly failed to perform, and on August 4 the Warshovskys declared the contract canceled and notified Gladstone; that up to that time they were ready and willing to perform. It was after thus giving the notice of July 27 that the Warshovskys learned that Waisman was interested in the contract as a purchaser. This suit was brought August 14, 1925.

The master, among other things, found that shortly after the execution of the contract Warshovsky demanded of Cossman an explanation of the absence of a provision in the contract requiring the purchaser to assume the special assessments, and Cossman stated, in substance, that he was sorry for having overlooked the omission but it was too late to rectify it. Notwithstanding the omission the Warshovskys concluded to carry out the contract as written. They discharged Cossman and employed Samuel Pincus as their attorney in consummating the contract. The complainant employed Edelman & Caplan. During the early part of June, 1925, Pincus turned over to Caplan an abstract of title to one of the lots and an order for a guaranty policy as to the other, and between that time and about July 29 Pincus made repeated demands upon Caplan to consummate the contract. During that time Caplan made certain objections to the title, which Pincus cleared up to the satisfaction of Caplan. The complainant and the broker, Waisman,

urged their attorney, Caplan, to delay the closing of the transaction as long as possible, it clearly appearing from the facts and circumstances in evidence that the complainant and Waisman had for their purpose the finding of a purchaser, before closing the contract with the defendants, for a price much higher than the purchase price in the contract, and advertised the real estate in question for sale in their effort to find a purchaser. Pincus having failed to secure from Caplan a specific promise to consummate the contract within a definite time, served a notice upon Edelman & Caplan by registered letter dated July 27, 1925, that all objections to the title had been cured, that the defendants were ready to close the transaction at once, and unless it. was closed within five days from date the contract would be declared canceled and the deposit forfeited. This letter was received by Edelman & Caplan in the regular course of mail. On August 1, 1925, they wrote to the complainant advising him of its receipt and inclosing a copy. Before the receipt of this letter Edelman & Caplan had written to the complainant and Waisman on July 22, 1925, that Pincus had called them several times, insisting upon the immediate closing of the deal; that they could not prolong the matter longer than August 1, 1925, and advising them to make all preparations to close the transaction at that time. At the end of the five days neither the complainant nor his attorneys offered to meet the defendants or their attorney to consummate the contract, and thereupon, on August 4, Pincus by letter notified the complainant and Waisman that because of the failure of Edelman & Caplan or the complainant to act in the matter of consummating the contract in accordance with the previous notice the contract in question was declared canceled. The master further found that Waisman had a joint interest with the complainant in the contract of purchase and though acting as the broker for the defendants concealed that fact from them, the complainant did not disclose it, and the defendants did not learn of

it until after the written demand was made by their attorney on July 29; that the complainant and Waisman were guilty of bad faith in the preparation of the contract and in their dealings with the defendants afterward and made no effort in good faith to consummate the contract within a reasonable time. Warshovsky was a working bricklayer, uneducated, unable to read or write English and unable to sign his name in English. His signature to the contract is in Yiddish.

We have read the evidence and it sustains the master's report. It would serve no good purpose to set down in this opinion an analysis of it in detail. It is contradictory. The testimony of Gladstone and Waisman on the one hand and the Warshovskys on the other cannot be reconciled. They contradicted one another on most of the material questions in issue. The execution of the contract is not denied, but there is a dispute as to whether it states the terms of the agreement in regard to the assumption of the special assessments. The Warshovskys, however, adopted and ratified the contract as written. After the defendants discharged Cossman and employed Pincus as their attorney the latter had charge of the affair for them and Oscar S. Caplan was employed by the complainant. Louis Edelman was associated with Caplan and examined the abstract which Warshovsky had delivered to Cossman and Cossman had in turn delivered to Caplan. None of these lawyers represented either of the parties in this case and all testified as witnesses at the trial. Caplan testified that three or four weeks after the date of the contract Gladstone and Waisman came to his house and told him they had bought some lots and wanted to protect themselves so that the property should not be sold. Caplan told them to record the contract, and they said that was already done. Waisman told him they wanted to delay the deal a little while because they could make some money if they could do so. They wanted to know how long they could delay it, and Caplan told them

he would try to delay it as long as he could. Caplan got the abstract to one of the lots from Pincus the same week and an order on Koester & Zander for the guaranty policy on the other, which they held, so that he could get the policy from them and have it continued. He and Edelman looked it over and gave an opinion which Caplan presented to Pincus, telling him there were several objections, which Pincus attempted to cure. He had afterward several conversations with Pincus, and on July 22 notified Waisman and Gladstone by letter that Pincus had called several times and was insisting on the immediate closing of the deal or he would declare the deposit forfeited; that Caplan believed that they could prolong the matter until about August 1 but not later, and therefore advised to be ready to close the deal at that time. On August 1 he wrote Gladstone advising him that the objections to one lot had been practically cured, on the other an opinion was given by the Chicago Title and Trust Company, which was better and took the place of an abstract, and this lot was practically clear of objections. Edelman testified that he was associated with Caplan in the practice of law; that Waisman brought Gladstone into Edelman's office and introduced him to Edelman, saying, "This is Mr. Gladstone, who is a partner in the lot with me; now, we want you to go over this abstract and go over it thoroughly, and we want you to raise all the objections that you can, because we want to try to sell this lot." This was about the time of the date of the opinion, July 27, 1925.

It is manifest that if Waisman was not originally interested with Gladstone as a purchaser of the premises he became so interested jointly during the progress of the business and they were acting together. After the contract was executed the lots were advertised for sale in the *Jewish Courier* by Waisman, with Gladstone's consent, at $200 a foot. The two called on Caplan together, saying they had bought the lots and wanted to delay the deal, and Caplan

agreed to try to delay it as long as he could. A delay of several weeks, during which Pincus was telephoning Caplan frequently that Warshovsky was eager to go through and close the business as he wanted the money to invest in other property, occurred. Caplan said he was not ready, and Pincus said he thought the deal was being delayed for some reason. Finally, on July 22 Edelman & Caplan wrote to both Waisman and Gladstone that Pincus was demanding an immediate closing of the deal, and they believed they could delay it until August 1 but not later, and advising preparation to complete the transaction at that time. The delay which Gladstone and Waisman had desired had been obtained to the fullest extent possible, and on August 1 Edelman & Caplan notified them that the objections to the title had been practically cured, and Pincus, whose letter of July 29 was inclosed, was demanding for Warshovsky the immediate closing of the affair.

The plaintiff in error in his brief insists that the attempted cancellation of the contract was not in good faith but was a collusive act between Pincus and Caplan. There is nothing in the evidence which justifies this charge. The plaintiff in error relies upon the fact that Pincus was chief prosecuting attorney of the city of Chicago and Caplan was an assistant prosecutor, both appointed by the mayor and subject to removal by the same authority, though Pincus' was the higher office. The plaintiff in error's counsel say that Caplan's very livelihood apparently depended upon Pincus' good will; that Caplan was not in a position to deal with Pincus at arm's length, and Pincus apparently used all the advantage he had to render Caplan's resistance powerless and put his client in default. They insist that they were like members of the same law firm representing opposite sides of a controversy, and either should have withdrawn from representing his client as soon as he learned that the other represented the adverse interest. There is not the slightest reason for the inference of collusion which

counsel draw from the political or official relation of the two attorneys nor any basis for it in the evidence.

It is immaterial whether Warshovsky had the right to rescind the contract or not. He was not asking a rescission. He was defending against the plaintiff in error's claim for a specific performance. The burden was not on him to show that he had complied with the contract but was on the plaintiff in error to show that he had been able, ready and willing to perform, and he could not put the defendants in error in default until he had tendered performance on his part. A party to a contract seeking its specific performance must show that he has performed all the terms of the contract on his part to be performed, or that he was able, ready and willing to do so but was prevented by the other party. (*Johnson* v. *Crouch*, 325 Ill. 559.) A purchaser cannot hold back and gamble on the future rise in value of property. *Stuckrath* v. *Briggs & Turivas*, 329 Ill. 555.

Proof of the allegation in the bill of the tender of $11,075 was necessary to enable the complainant to maintain his suit and was not made. Gladstone testified that he offered Warshovsky the money four times: "I told him in the synagogue once I give him the money; in his house, that is two; I offer him the money in Humboldt Park, that is three; and I had the money with me when I went with Waisman on Iowa street, that is four. Waisman stayed in the house on Iowa street about half an hour. I stayed outside all the time with the machine. When I was at his house at 917 Fairfield avenue I told him I had the money with me. 'Come on; we will go to the lawyer and we will close the deal; I am going away to Benton Harbor.' Pincus was mentioned by name. I had the money in my inside right-hand pocket of the coat. I have all the money, $11,075. I didn't take the money out of my pocket—I just simply told him I had it." All this is denied by Warshovsky and Mrs. Warshovsky. She testified that the only times Gladstone was ever in their house were on May 13 (the

date of the contract) and in September after the suit was begun. Waisman testified that he saw Gladstone offer Warshovsky money one time at 917 North Fairfield avenue, in the middle of July. He did not see the money but saw the envelope it was wrapped in at Gladstone's house. Gladstone got it from his bed-room and wrapped it up in paper in the dining-room and put it in his pocket. He did not see Gladstone offering money, only he asked him to go through with the deal. He did not know how much money was in the bundle aside from what Gladstone told him. This supposed tender is stated to have occurred about the middle of July, after Warshovsky had complied with the requirement of the contract that he should deliver the abstract to Cossman for continuation and had employed Pincus to act for him in carrying out the performance of the contract and Gladstone had employed Caplan to secure as much delay as possible in its performance and Pincus was urging upon Caplan the conclusion of the affair. In view of the instructions of Gladstone to his attorney, of his contradictory accounts of the various offers of money he claimed to have made when he did not have the money with him, of the improbability of his account of the manner of his getting and keeping the money which he testified he had, his testimony cannot be regarded as sufficient to outweigh the direct contradiction of the defendants and the circumstances tending to discredit his testimony. The evidence shows that the plaintiff in error, instead of being eager to perform his contract, sought to delay its consummation while he speculated on the result of his efforts to dispose of the property at an advance.

The decree is affirmed.
*Decree affirmed.*